**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GARY  MILLER IMPORTS, INC.,** | ) | |
| **Plaintiff,** | ) | **Civil Action No. 1:11-CV-178** |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| | ) | **Re: Motion for Summary Judgment** |
| **CARTER DOOLITTLE, et al.,** | ) | **ECF No. 121** |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION</u>**

U.S. D.J. Susan Paradise Baxter

**I.      Introduction**

Pending before this Court is Defendants' motion for summary judgment. ECF No. 121.

Jurisdiction is grounded in a civil claim asserted by Plaintiff Gary Miller Imports (GMI) under

the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961-68[1]. ECF

No. 1. Plaintiff also raises state law claims of fraud and constructive fraud, conversion of

corporate property, breach of fiduciary and employee duty, unjust enrichment, aiding and

abetting and conspiracy. ECF No. 1.

There are four Defendants in this matter: Carter Doolittle, Brent Doolittle, Kevin

Doolittle, and Landmark Chevrolet, Inc., a car dealership in New York state. The RICO claim, as

---

[1] The RICO claim is based on the predicate acts of mail fraud in violation of 18 U.S.C. § 1341;
wire fraud in violation of 18 U.S.C. § 1343; transportation of stolen goods across state lines in
violation of 18 U.S.C. § 2314; transportation of stolen money across state lines in violation of 18
U.S.C. § 2314; and receipt of stolen goods that have crossed states lines in violation of 18 U.S.C.
§ 2315. ECF No. 2, RICO Case Statement.

well as the conversion and conspiracy claims, are levied against all four Defendants. The aiding

and abetting claim is brought against Kevin Doolittle and Landmark Chevrolet. Finally, all other

legal claims are brought against Carter Doolittle and Brent Doolittle.

## II.     Factual and Procedural Background

Although the long history of the association between the parties is well-known to

them, some of that history is required here to provide background for the Court's decision.

Most of what follows is undisputed. Any disagreement between the parties on a particular factual

or procedural point will be noted when relevant.

Plaintiff here is Gary Miller Imports which was formerly known as Gary Miller Dodge

("GMD"). GMD was incorporated in 1980 and Gary L. Miller (Miller) has been either the sole or

majority owner/shareholder since that time. ECF No. 123, ¶ 9. Miller is also the majority

shareholder of two other enterprises: Contemporary Motor Cars, Ltd., and Miller Management

Group. *Id.*, ¶¶ 13, 15. Defendants Brent, Carter, and Kevin Doolittle (collectively, "the

Doolittles") are brothers who have worked in the retail automotive field since the 1970s and have

been acquainted with Miller since then. *Id.*, ¶ 16. In 1992, Brent and Carter Doolittle bought a

minority interest in GMD. *Id.*, ¶ 19. By 1997, Brent and Carter had acquired forty-nine percent

of GMD's shares. *Id.* From 1997 until 2009, the two brothers worked as employees of GMD in

addition to their positions as officers and directors of the company. *Id.*, ¶ 20.

In 2001, all three brothers purchased a controlling interest in Landmark Chevrolet in

Randolph, New York. *Id.*, ¶ 23.[2] And, in 2007, the Doolittle brothers purchased a controlling

_____

[2] The parties disagree as to whether Mr. Miller knew about the acquisition of Landmark by the
Doolittle brothers before its acquisition. Mr. Miller testified that he "was not aware of the
Doolittle brothers were planning to purchase the Landmark dealerships" and that he "did not

interest in Landmark Chrysler/Jeep in Westfield, New York in 2007. *Id*., ¶ 26. Between 2001 and 2009, GMD and the Landmark dealerships bought and sold vehicles to each other at wholesale prices, a practice the Doolittles claim was "common" in the automobile industry. ECF No. 122, p. 3;ECF No. 123, ¶ 148. One hundred and nine (109) of these transactions, beginning in March 2005 and ending in December 2009, form the basis of a portion of the RICO claim. ECF No. 1, ¶ ¶ 46-49; ECF No. 2, pages 7-10. The complaint details forty-one transfers of vehicles owed by GMD to Landmark Chevrolet [ECF No. 1, ¶ 46]; three transfers of vehicles from GMD to Landmark Chrysler Jeep [*id*. at ¶ 47]; forty-eight transfers from Landmark to GMD [*id*. at ¶ 48]; and seventeen transfers from Landmark Chrysler Jeep to GMD [*id*. at ¶ 49]. Each of these transactions resulted in a loss to GMD. *Id*. at ¶ ¶ 46-49.

In May 2009, after declaring its corporate bankruptcy, the Chrysler Corporation advised GMD that it was terminating its association with the dealership.[3] ECF No. 123, ¶ 28. Carter Doolittle, as President of GMD, sought to arbitrate the collapse of the business relationship. *Id*. at ¶ 31. *See also* Consolidated Appropriation Act of 2010, § 747, Pub. L. 111-117, 123 Stat. 3034, 3219-21; *Colonial Chevrolet Co. v. United States*, 145 Fed. Cl. 243, 245 (2019). Miller, however, quashed attempts at arbitration. *Id*. at ¶ 36; ECF No. 130, ¶ 32-33 (inclusive of footnote 2). The Doolittles sued GMD in state court as a result of Miller's repudiation of arbitration and

---

learn of the Doolittle brothers' interest in the Landmark dealerships until after they purchased them." *See* ECF No. 131, page 20, ¶ ¶ 10-11.

[3] Defendants recount Chrysler's actions in terms of "terminating the dealership." ECF No. 123, ¶ 28. Plaintiff disputes this, stating that Chrysler terminated its "sales and service agreement" with GMD. ECF No. 130, ¶ 28. This is a distinction without a difference. For purposes of this motion, it suffices to say that Chrysler, after declaring bankruptcy, severed its business relationship with GMD in May 2009.

the subsequent closure of GMD.[4] *Id.* at ¶ 33. Those proceedings are apparently pending and are largely irrelevant to these.

It is Plaintiff's position that upon winding up the GMD business around early 2010, Mr. Miller discovered many examples of either Brent or Carter Doolittle fraudulently enriching themselves at the company's expense. Mr. Miller then directed counsel "to undertake an investigation and he, along with an accountant, reviewed the records of GMD." ECF No. 131, ¶ 38. The investigation uncovered many nefarious dealings, some going back decades, that caused financial harm to GMD. These included the failure to pay expenses on credit cards in a timely manner, causing GMD to incur late charges and fees; the failure to pay expenses on credit cards resulting from Defendants Carter Doolittle's and Brent Doolittle's purchase of personal items with those credit cards; and the use of the accounting and payroll system of GMD to embezzle extra pay, unearned vacation pay, and unearned bonus payments.[5]

Upon a report of the findings of that investigation, Mr. Miller directed that legal action be taken "to hold the Doolittles responsible for the harm they caused GMD." *Id.* GMI filed this lawsuit against the Doolittles and Landmark in August 2011. ECF No. 1[6].The Doolittles and

---

[4] In that action filed in May 2010, the Doolittles assert several causes of action against Miller and others related to Miller's alleged numerous breaches of fiduciary duties owed to the Doolittles in his capacity as majority and controlling shareholder of GMD and his many actions intended to harm and oppress the Doolittles as minority shareholders of GMD. ECF No. 123, ¶ 44; ECF No. 130 ¶ 44.

[5] Throughout the briefing, Defendants downplay these allegations and characterize them as "murky credit card and employment allegations." ECF No. 122, pages 4-5.

[6] In accordance with Local Rule 7.1, Plaintiff filed a RICO Case Statement with the complaint. *See* ECF No. 2.

Landmark answered the Complaint. ECF No. 10. A long and disputatious period of discovery ensued.[7] This case was transferred to the undersigned in October 2018.

Now before this Court is the Motion for Summary Judgment filed by Defendants. ECF No. 121. They concomitantly filed a memorandum in support of their motion (ECF No. 122), a Concise Statement of Material Fact in compliance with our Local Rule 56(B)(1) (ECF No. 123), and an Appendix (ECF No. 124). GMI has filed a memorandum in opposition to the motion (ECF No. 129), a Responsive Concise Statement, which includes cross-statements (ECF No. 130), and an Appendix (ECF No. 131). Defendants then filed a Reply brief as well as their own Responsive Concise Statement. ECF No. 143, ECF No. 144. Given these filings, this motion is joined and ripe for disposition.

### III.    Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment must be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Under Rule 56, the district court must enter summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings,

---

[7] *See, e.g.*, ECF No. 26 (granting motion to extend discovery deadline); ECF No. 33 (same); ECF No. 44 (same); ECF No. 54 (same); ECF No. 58 (same); ECF No. 73 (same); ECF No. 85 (same); ECF No. 28 (granting motion to compel); ECF No. 59 (denying motion to compel); ECF No. 80 (granting motion to compel).

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323, *quoting* Fed. R. Civ. P. 56. In other words, the moving party has the initial burden of proving to the district court the lack of evidence supporting the non-moving party's claims. *Id*. at 330; *see also Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007); *UPMC Health Sys. v. Metro. Life Ins. Co.,* 391 F.3d 497, 502 (3d Cir. 2004).

After the moving party has satisfied this low burden, the non-moving party must provide facts showing that there is a genuine issue for trial to avoid summary judgment. *Id.* at 324. The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or suspicions will not suffice.'" *Jutrowski*, 904 F.3d at 288–89, *quoting D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) *citing Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006). The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249. Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

**IV.     Analysis and Discussion**

**A.     The RICO Claim under 18 U.S.C. § 1962**

Because the RICO claim is the only claim over which this Court has original jurisdiction, it will be addressed at the outset. Congress intended RICO to be a potent and flexible statute and the Supreme Court has instructed that it be read broadly. *Tabas v. Tabas*, 47 F.3d 1280, 1290-91 (3d Cir. 1995) (en banc) *quoting Sedima, S.P.R.L. v. Imrex Company, Inc.*, 473 U.S. 479, 497-98 (1985) ("'RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach, but also of its express admonition that RICO is to be liberally construed to effectuate its remedial purposes.'").

In *Sedima*, the Supreme Court recognized that by interpreting the RICO statute broadly the statute would be "use[d] not only against mobsters and organized criminals but also against 'respected and legitimate enterprises.'" *Id. Sedima* specifically concluded that Congress intended to "reach both legitimate and illegitimate enterprises" since "the former enjoy neither an inherent incapacity for criminal activity nor immunity from its consequences." *Sedima*, 473 U.S. at 499.

The focus of the court in any RICO case is the overall enterprise, which distinguishes it from garden variety fraud. When focusing on the enterprise as a whole, the court looks at the totality of the allegations of the RICO violation together because it is in those series of allegations that the alleged RICO scheme or enterprise is found; not on any one single allegation of fraud alone.

*Elements of a RICO Claim*

The common thread running throughout the RICO statute, 18 U.S.C. § 1962, is that an injured party must establish that the defendant was engaged in a "pattern of racketeering

7

activity." *Tabas*, 47 F.3d at 1289. GMI sues under § 1962(c) and (d) of the statute.[8] Section

1962(c) provides that "it shall be unlawful for any person employed by or associated with any

enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a

pattern of racketeering activity ..." 18 U.S.C. § 1962(c). Section 1962(d) prohibits any person

from conspiring to violate any of the other subsections of the statute. 18 U.S.C. § 1962(d).

      To prevail on a claim of § 1962(c), a plaintiff must prove: (1) conduct (2) of an enterprise

(3) through a pattern (4) of racketeering activity. *Kolar v. Preferred real Estate Investments, Inc*.,

361 Fed. App'x 354, 362 (3d Cir. 2010) *quoting Sedima*, 473 U.S. at 496.[9] And, in order to

succeed on a § 1962(d) claim, the RICO conspiracy provision, a plaintiff must show that the

defendants (a) agreed to commit predicate racketeering acts[10] (2) with knowledge that the acts

formed a pattern of racketeering activity in violation of any of the other subsections of § 1962. *A-*

*Valey Engineers, Inc. v. Board of Chosen Freeholders of County of Camden*, 106 F. Supp. 2d

711, 717 (D.N.J. 2000).

*Parameters of GMI's RICO Claim*

---

[8] Although Plaintiff's RICO claim was originally pled as violations of §§1962(a), (c) and (d) (ECF No. 2, page 1), Plaintiff has conceded that it does not have a viable claim under § 1962(a). *See* ECF No. 129, page 18 n. 98.

[9] *But see Rehkop v. Berwick Healthcare Corp.,* 95 F.3d 285, 289 (3d Cir. 1996) (characterizing the same elements of a RICO claim as three basic elements instead of four: (1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity).

[10] The  statute lists offenses which may make up the predicate acts including 18 U.S.C. § 1341 (relating to mail fraud), 18 U.S.C. § 1343 (relating to wire fraud), 18 U.S.C. § 2314 (relating to transportation of stolen money or goods across state lines), and 18 U.S.C. § 2315 (relating to receipt of stolen goods that have crossed state lines), all of which apply in this case. *See* 18 U.S.C. § 1961(1).

Before addressing the defenses to the RICO claim, it is important to review the contours of GMI's claim. In the complaint, Plaintiff makes a series of factual allegations that base the single RICO count. Plaintiff alleges that Defendants participated in "a number of unlawful acts which constituted a pattern of racketeering activity," including:  (1) the arrangement of transferring automobiles between GMD and Landmark; (2) the use of GMD's cash to pay personal expenses and personal credit card bills; (3) the failure to make payments on GMD issued credit cards thereby incurring late charges and fees; (4) the manipulation of the accounting and payroll systems of GMD to pad accounts with personal expenses, to embezzle extra pay, unearned vacation pay, and unearned bonus payments; and (5) the leveraging of assets of GMD to purchase inventory and sell it to friends and family at a loss to GMD. ECF No. 1, ¶ 99.

GMI identifies the enterprise as "the Landmark Enterprise," an association-in-fact enterprise, composed of each of the three individual Doolittle brothers, as well as Defendant Landmark Chevrolet, Inc. and non-defendant Landmark Chrysler Jeep, Inc. ECF No. 2, page 18. GMI summarizes Defendants' overall scheme:

> The Defendants have worked together to direct funds and property from GMI to the members of the Landmark Enterprise by transporting stolen vehicles from Pennsylvania to New York, receiving these stolen vehicles in New York, placing money that was taken by fraud from GMI in interstate commerce, altering records of GMI, abusing the trust of GMI through breach of fiduciary duties and failing to conform to established practices and procedures of GMI while representing that said procedures were being followed.

*Id*. GMI describes the course of conduct of the Landmark Enterprise as:

> exist[ing] for the purpose of making money for its members through automobile sales. Individuals Carter Doolittle, Brent Doolittle, and Kevin Doolittle are brothers. Together, they own interest in and work together to operate Defendant Landmark Chevrolet, Inc., an automobile dealership, and formerly operated landmark Chrysler Jeep, Inc., which was an automobile dealership. Defendants Carter Doolittle, Brent Doolittle, and Kevin Doolittle worked together systematically with Landmark Chrysler Jeep, Inc. and Defendant Landmark

> Chevrolet, Inc. to channel funds and assets from GMI to the members of the
> Landmark Enterprise.

*Id*. And finally, GMI describes the activities of the enterprise and the pattern of racketeering

activity:

> The usual and daily activities of the Landmark Enterprise are concerned with the
> selling automobiles and related activities. The pattern of racketeering activity
> existed for the purpose of diverting funds and assets from GMI to enrich the
> Landmark Enterprise and its members at the expense of GMI. The pattern of
> racketeering activity used the business machinery of its entity members,
> Landmark Chevrolet, Inc., and Landmark Chrysler Jeep, Inc., as part of its
> purpose to create unlawful profit at the expense of GMI, by transferring vehicles
> to and from GMI in such a way as to create profit for the Landmark Enterprise.

*Id*. at 19.

### 1)     The Pattern Element

Defendants move for summary judgment arguing that Plaintiff has failed to establish

continuity which is a required part of RICO's pattern element. ECF No. 122, page 16 *et seq*.

A pattern of activity is defined by statute as requiring "at least two acts of racketeering

activity" within a ten-year period. 18 U.S.C. § 1961(5). To show a pattern of racketeering

activity, a plaintiff must establish that the predicate acts are (1) related[11] and (2) that they either

amount to continued activity or pose a threat of continued activity. *Tabas*, 47 F.3d at 1292,

*quoting H.J. Inc. v. Northwestern Bell Tel.Co*., 492 U.S. 229, 239 (1989). This second

component of the inquiry is often known as "continuity."

The Third Circuit has explained that  "… the ambit of RICO may encompass a legitimate

businessman who regularly conducts his business through illegitimate means, that is, who

---

[11] The predicate acts are related if they "have the same or similar purposes, results, participants,
victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics
and are not isolated events." *Id*. Defendants do not argue that Plaintiff cannot meet the
relatedness inquiry.

repeatedly defrauds those with whom he deals and in the process commits predicate acts, for instance by using the postal service as a means of accomplishing his scheme." *Id.* at 47 F.3d at 1293. In determining whether continuity has been proven, courts must use a fact-oriented, case by case approach. *Id. See also Barticheck v. Fidelity Union Bank/First Nat'l State,* 832 F.2d 36, 39 (3d Cir. 1987).

Despite Defendants' argument to the contrary, there is sufficient evidence to satisfy the continuity requirement here. The many and repeated vehicle transfers alone over a period of five years are enough to establish the requisite continuity. *See Tabas*, 47 F.3d at 1296, n.21, *quoting Hindes v. Castle*, 937 F.2d 868, 873 (3d Cir. 1991) ("[I]t remains clear […] that 'duration is the *sine qua non* of continuity.'"). *See also*, *id*. at 1292, *quoting H.J. Inc*., 492 U.S. at 241-42 (explaining that continuity is "centrally a temporal concept."). *Tabas* held that a scheme lasting over three and a half years met the durational aspect to establish continuity. *Id*. at 1295-96.

### 2)      The Enterprise Element

Next, Defendants argue that Plaintiff has failed to establish the enterprise element of a RICO claim because the alleged RICO "persons" are indistinct from the alleged "enterprise." Defendants assert that there is not enough separateness between them to constitute an enterprise under the statute. *See* ECF No. 122, page 17-19.

"[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a person; and (2) an enterprise that is not simply the same person referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). The statute defines a "person" as "any individual or entity capable of holding a legal or beneficial interest in property" (18 U.S.C. § 1961(3)) and an "enterprise" as any "individual, partnership,

corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

The Supreme Court has expressed that an association-in-fact enterprise "is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981). "There is no restriction upon the associations embraced by the definition: an enterprise includes any union or group of individuals associated in fact." *Id.*

An association-in-fact enterprise must have "structure[12], continuity, and distinctness."| *Valcom, Inc. v. Vallardita*, 2014 WL 1628431, at *5 (D.N.J. 2014). As for distinctness, the association-in-fact enterprise must be "an entity separate and apart from the pattern of activity in which it engages." *Deckard v. Emory*, 2020 WL 3960421, at *10 (E.D. Pa. 2020) (internal quotations omitted). In other words, a plaintiff must prove the existence of a RICO enterprise that is "distinct" from the defendants themselves. *MacDonald v. CashCall, Inc.*, 2017 WL 1536427, at *14 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018).

GMI identifies the enterprise here as an association-in-fact made up of the three individual Doolittle brothers, Defendant Landmark Chevrolet, Inc., and non-defendant Landmark Chrysler Jeep, Inc. ECF No. 2, page 18. GMI dubs this enterprise as "the Landmark Enterprise" and asserts that each of the four Defendants "is an individual or entity separate and apart from

---

[12] Recently, the Third Circuit has explained that "the structure necessary for a § 1962(c) enterprise is not complex": "an enterprise need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, [or] established rules and regulations…" *United States v. Fattah*, 914 F.3d 112, 163 (3d Cir. 2019) *explaining Boyle v. United States,* 556 U.S. 938, 946 (2009).

the Landmark Enterprise." *Id.* In its opposition brief, GMI clarifies that the Landmark Enterprise

consists of three separate components: "(1) Brent Doolittle and Carter Doolittle as officers and

employees of Miller Dodge; (2) Kevin Doolittle as an officer and employee of Landmark; and

(3) Landmark Chevrolet." ECF No. 129, page 26.

      As the Supreme Court has pointed out, an employee of a corporation is distinct from the

corporation itself because the corporation is "a legally different entity with different rights and

responsibilities due to its different legal status" and nothing in the statute "requires more

'separateness' than that." *Cedric Kushner Promotions*, 533 U.S. at 163. One person and one

wholly owned entity are distinct for RICO purposes. *United States v. Bergrin*, 650 F.3d 257, 266

(3d Cir. 2011) *citing Cedric Kushner Promotions*, 533 U.S. at 163.[13]

      Plaintiff summarizes the activities of the enterprise as they relate to the vehicle

transactions:

> Brent or Carter would authorize a sale or purchase on behalf of GMD, Kevin
> Doolittle would authorize a sale or purchase on behalf of Landmark, Landmark
> would process the sale as an authorized and duly licensed auto dealership, and
> then return the profits to it's [sic] shareholders, Kevin, Brent and Carter Doolittle.
> Without the involvement of Landmark, a duly incorporated business with a
> license from the State of New York to sell new and used vehicles, the Doolittle
> brothers' scheme could never have been accomplished. The reason the Doolittles
> needed an auto dealership to conduct the fraudulent transaction with GMD, was to
> give the veneer of legality.

---

[13] The Supreme Court also explained: "The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more 'separateness' than that.... [L]inguistically speaking, the employee and the corporation are different 'persons,' even where the employee is the corporation's sole owner. After all, incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs." 533 U.S. at 163.

ECF No. 129, page 30. The deposition testimony of Brent supports the interaction between himself and Kevin and Landmark. *See* ECF No. 124-24, page 30. Because there is a showing of distinctness to satisfy the enterprise element, summary judgment will be denied in this regard.

### 3)    The Racketeering Activity Element

Defendants argue that because there is no scheme to defraud, Plaintiff cannot establish that Defendants engaged in any racketeering activity. This Court disagrees.

That an enterprise "must conduct its affairs through a pattern of racketeering activity" is an element of the § 1962(c) RICO claim. *United States v. Fattah*, 914 F.3d 112, 163 (3d Cir. 2019). The statute defines "racketeering activity" to include several criminal acts such as mail and wire fraud, transportation of stolen goods and money across state lines, and receipt of stolen goods that have crossed state lines. *See* 18 U.S.C. § 1961(1). These are known as the predicate acts.

Plaintiff's RICO claim turns on the predicate acts of mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343, as well as transportation of stolen goods across state lines in violation of 18 U.S.C. § 2314, transportation of stolen money across state lines in violation of 18 U.S.C. § 2314, and receipt of stolen goods that have crossed states lines in violation of 18 U.S.C. § 2315. ECF No. 2, RICO Case Statement. And although not pled in the complaint or the RICO statement, Plaintiff also argues that there is evidence of honest services fraud, which can serve as a predicate offense under RICO. *See* 18 U.S.C. § 1346. Generally, "honest services fraud is a bribery or kickback scheme involving a public official, *e.g., United States v. Bryant,* 655 F.3d 232 (3d Cir. 2011) although it can involve a private fraud scheme, *see Skilling,* at 2934 n.45." *Kaul v. Christie*, 372 F. Supp. 3d 206, 248 (D.N.J. 2019). If

14

Plaintiff wishes to amend its complaint to add this theory, it may move to do so, and the Court will receive opposition to such a motion.

The mail and wire fraud statutes prohibit the use of the mails or wires in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341 (mail fraud); § 1343 (wire fraud). The honest-services statute, § 1346, defines "the term 'scheme or artifice to defraud'" in these provisions to include "a scheme or artifice to deprive another of the intangible right of honest services." *See also Skilling v. United States*, 561 U.S. 358, 369 n.1 (2010).

There is undisputed record evidence to support that the predicate acts of wire and mail fraud[14] were present in the dealership-to-dealership transactions. For example, in his deposition, Carter Doolittle confirmed that money for these inter-state transfers was exchanged by check. ECF No. 145-15, Deposition of Carter Doolittle, dated December 3, 2013, page 5.[15] And, CPA Carl Woodard testified that is would have been impossible "to accomplish the vehicle transfers at issue without the use of mail, telephones, faxes, and computers." ECF No. 131, page 10, ¶ 40. Moreover, in support of its claim, Plaintiff points to evidence that

- Mail, telephones, faxes, and computers played an essential role in the sales and service at the time of the transfers [ECF No. 131, Declaration of CPA Carl Woodward, page 10, ¶ 37 and Declaration of Gary Miller, page 28, ¶ 58];

- Mail, telephones, faxes, and computers were used to communicate with potential and existing customers and suppliers, manufacturers, lenders, insurance company representatives and state officials who process taxes, titles, and registrations [ECF No. 131, page 10, ¶ 38 and page 28, ¶ 59];

---

[14] The elements of mail and wire fraud are (1) "a scheme or artifice to defraud for the purpose of obtaining money or property," (2) "participation by the defendant with specific intent to defraud," and (3) "use of the mails or wire transmissions in furtherance of the scheme." *Jacovetti Law, P.C. v. Shelton*, 2020 WL 5211034, at *2 (E.D. Pa. Sept. 1, 2020) *quoting Nat'l Sec. Sys. v. Iola*, 700 F.3d 65, 105 (3d Cir. 2012).

[15] Plaintiff points to the deposition of Kevin Doolittle for additional support of this point. Yet the deposition of Kevin Doolittle has not been provided to this Court.

- Mail, telephones, faxes, and computers were used to ascertain the amount necessary to pay existing loan payoffs, and to apply for and receive funding for vehicle transactions [ECF No. 131, page 10, ¶ 39 and page 28, ¶ 59]; and

- Computers were used to process all sales transaction [*Id.*].

The evidence of record is sufficient to establish an issue for the jury of whether Defendants engaged in mail and wire fraud in connection with the dealership-to-dealership transactions and is sufficient to defeat Defendants' motion for summary judgment.[16]

### 4)      The Statute of Limitations

Defendants contend that GMI's RICO claim is time barred, having been brought well past the applicable statute of limitations. Not surprisingly, Defendants narrowly focus on only one part of the RICO claim – the transfer of cars between GMD and Landmark – because in that one factual scenario, annual audits support Defendants' argument that there was knowledge of these transactions long before suit was filed, which supports their motion that the action is out of time under the statute of limitations.

This is a recurring omission throughout Defendants' briefing. That said, it is nowhere more apparent and more problematic than it is in the analysis of the statute of limitations defense. By choosing to limit their argument on statute of limitations to only a portion of the RICO claim, Defendants miss the mark. Plaintiff's allegations about the pattern of racketeering activities are extensive and far-reaching. Moreover, thousands of pages of documentary evidence

---

[16] Defendants also argue that Plaintiff's failure to provide evidence to support the § 1962(c) claim mandates the dismissal of the §1962(d) claim. While a § 1962(d) claim cannot survive without the presence of claim under another subsection of the statute, there is sufficient evidence in the record to put Plaintiff's § 1962(c) claim to a jury.

have been produced in this case. Perhaps there could be evidence within the record that supports

a statute of limitations defense as to all parts of the far-reaching RICO claim. Still, Defendants

have not pointed to such evidence and it is their burden to do so in order to fully support their

motion for summary judgment. *Celotex*, 477 U.S. at 323.

This Court need only consider the evidence that the parties cite in their summary

judgment filings. Fed. R. Civ. P. 56(c)(3). Neither the Rules of Civil Procedure nor the interests

of judicial economy allow for the Court to search for evidence either to support a party's position

or to find a dispute to defeat summary judgment. *See Swanson v. City of Plano,* 2020 WL

6799173, at *2 (E.D. Tex. Nov. 19, 2020) *quoting Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909,

915–16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 832 (1992) (courts are not required "to sift

through the record in search of evidence to support a party's opposition to summary judgment.").

This Court will conduct a statute of limitations analysis on the portion of the RICO claim as it is

raised in Defendants' motion for summary judgment.

The statute of limitations for a civil RICO claim is four years. *Rotella v. Wood*, 528 U.S.

549, 554 (2000); *Agency Holding Corp. v. Malley–Duff & Assoc.*, 483 U.S. 143, 156 (1987)

(selecting a four-year statute of limitations for civil RICO actions). GMI filed its Complaint on

August 19, 2011. ECF No. 1. Considering the applicable four-year statute of limitations, the

Court must thus determine whether the statute began to run on or before August 19, 2007. If the

limitations period began to run on or after that date, GMI's claims are timely; before then, they

are too late.

The clock begins to run on civil RICO claims when the plaintiff is found to have received

"inquiry notice." *Grant Heilman Photography, Inc. v. McGraw-Hill Glob. Educ. Holdings, LLC*,

2015 WL 1279502, at *11 (E.D. Pa. Mar. 20, 2015) *citing Mathews v. Kidder, Peabody & Co.,*

*Inc*., 260 F.3d 239, 251–52 (3d Cir. 2001). A plaintiff is on inquiry notice "whenever circumstances exist that would lead a reasonable [person] of ordinary intelligence, though the exercise of reasonable due diligence, to discover his or her injury." *Matthews*, 260 F.3d at 252. The Court of Appeals for the Third Circuit has adopted the "injury discovery rule" to determine when such circumstances exist. *Forbes v. Eagleson*, 228 F.3d 471, 483–484 (3d Cir. 2000) (adopting the injury discovery rule); *Weiss et al. v. Bank of Am. Corp*., 2016 WL 6879566, *1-2 (W.D. Pa. Nov. 22, 2016). Under this rule, plaintiffs have inquiry notice of their claims when they knew or "should have known of the basis for their claims, which depends on whether and when they had sufficient information of possible wrongdoing to … excite 'storm warnings' of culpable activity." *Weis*, 2016 WL 6879566, at *1 (citation omitted). Put another way, "a plaintiff is on inquiry notice of her wounds when the circumstances would have led a reasonable person to discover them through due diligence." *Hawk Mountain LLC v. Ram Capital Grp*., 689 Fed. App'x 703, 706 (3d Cir. 2017) *citing Cetel v. Kirwan Fin. Grp., Inc*., 460 F.3d 494, 507 (3d Cir. 2006).

The parties focus their statute of limitations arguments only on the fraudulent transfer of vehicles and parts between both Landmark dealerships and GMD. Both sides fail to argue how the statute of limitations applies to the other portions of the RICO claim. For instance, the parties have made no argument, and have pointed to no evidence (as is the movants' burden to do), as to how the statute of limitations relates to: (1) the use of GMD's cash to pay personal expenses and personal credit card bills; (2) the failure to make payments on GMD issued credit cards; (3) the manipulation of the account and payroll systems for personal gain; and (4) the leveraging of assets of GMD to purchase inventory and sell it to family and friends at a loss to GMD. In this

18

regard, Defendants' arguments are too narrowly focused on conduct that bases only a portion of the enterprise of the RICO claim.

As discussed above, a RICO claim is a broad enterprise of racketeering activity. So too any analysis of the statute of limitations defense to a RICO claim must speak to all of the factual circumstances in which a reasonable person (here, the company) would have discovered its "wounds" through due diligence. *Hawk Mountain*, 689 Fed. App'x at 706. So then, even if Defendants succeed in their statute of limitations defense, it is only as to a portion of the RICO claim and not the entire RICO claim. With this in mind, we turn to Defendants' argument whether the portion of the RICO claim that is based on the transfer of autos is time barred by the statute of limitations. *See* ECF No. 122, page 9 *et seq*.

Defendants contend that Plaintiff discovered its injury arising out of the dealership-to-dealership transfers prior to 2005. Meanwhile, GMI contends that Mr. Miller did not discover the alleged fraudulent transactions until Miller began the process of closing GMD around early 2010[17]. ECF No. 129, n. 130. Thus, Plaintiff subjectively discovered its injury in 2010 and its claim against the Defendants accrued no later than that year. Still, this does not mean that the claim could not have accrued earlier.

The analysis of the objective component of inquiry notice is twofold. *Matthews*, 260 F.3d at 252. First, the burden is on the defendant to show the existence of "storm warnings" that may have conveyed the possibility of fraud. *Id.* at 251-52, *citing Havernick v. Network Express*, 981 F. Supp. 480 (E.D. Mich. 1997); *Addeo v. Braver*, 956 F. Supp. 443 (S.D.N.Y. 1997). If storm

---

[17] GMI does not offer a specific date for this discovery, but presumably, it would have been sometime in early 2010. *See* ECF No 133, ¶ 32; ECF No. 124-4, p. 12 (Miller's testimony that when the Doolittles were fired on February 20, 2010, "we were in the wind-down stage, and I supervised the wind-down.").

warnings were indeed on the horizon, the burden shifts to the plaintiff to demonstrate that he attempted to steer clear. That is, that he "exercised reasonable diligence and yet [was] unable to discover [his] injuries." *Id.*

The storm warning inquiry puts the defendant in the challenging position of showing that its fraudulent conduct was so obvious that the plaintiff should have discovered its own injuries. *See Mathews*, 260 F.3d at 250. The Third Circuit has declined to set out an exhaustive list of what constitutes "storm warnings" but has described their existence as "a totally objective inquiry" emphasizing that "[p]laintiffs need not be aware of the suspicious circumstances or understand their import." *Id*. at 252.[18] Thus, storm warnings need not contain a high degree of certainty or specificity. Indeed, the Court has underscored that "[i]t is enough that a reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning." *Id*.

Defendants point to Gary Miller's own deposition testimony to establish the existence of storm warnings. Mr. Miller's deposition testimony (from December 12, 2014[19]) confirms that he learned about the vehicle transfers between GMD and Landmark Chevrolet as early as 2003 for calendar year 2002. ECF No. 124-1, page 33.[20] Moreover, Miller testified at his January 5th, 2016

---

[18] The Third Circuit has further explained: "it is enough that a reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning. Thus, investors are presumed to have read prospectuses, quarterly reports, and other information relating to their investments. This comports with the general purpose of civil RICO to encourage plaintiffs to actively investigate potential criminal activity, to become 'prosecutors, private attorneys general,' dedicated to eliminating racketeering activity." *Mathews*, 260 F.3d at 250, *quoting Rotella*, 528 U.S. at 557.

[19] Mr. Miller, like most of the principle actors in this litigation, has been deposed more than once.

[20] Miller's testimony is supported by the Notes to the Financial Statements for 2002, as well as the Minutes from the Shareholder Meeting. Note 8, titled "Related Party Transactions," on the 2002 Financial Statement reveals that GMD "buys and sells automobiles and parts from Landmark Chevrolet (a company owned by Brent and Carter Doolittle)." ECF No. 124-31, page

deposition that he reviewed "almost every single account on all four pages, from the first entry, which was cash, to the very last entry, which was personnel count." ECF No. 123, ¶ 62. And, prior to 2008, Miller personally reviewed in detail financials of GMD almost every month or at least ten out of twelve months a year. *Id*. at ¶ 64.

Plaintiff argues that these financial statements cannot possibly constitute storm warnings because there is no evidence that the transfers in these calendar years (2002, 2003, and 2004) were fraudulent in any way. Indeed, the scope of GMI's allegations is limited to the period from March 2005 through December 2009. In other words, Plaintiff alleges that the transfers became fraudulent beginning at the earliest in March 2005. ECF No. 1, ¶ ¶ 46-49. In its opposition brief, Plaintiff makes clear that although there were transactions between Landmark and itself before 2005, they were not fraudulent. Moreover, GMI argues at length that an audit is not designed to uncover fraud:

> "Because of the inherent limitations of an audit, combined with the inherent limitations of internal control, and because an auditor will not generally perform a detailed examination of all [individual] transactions, there is a risk that material misstatements may exist and not be detected by the auditors, even though the audit is properly planned and performed in accordance with U.S. generally accepted auditing standards."

ECF No. 129, page 40. In support of its position, GMI cites the Declaration of Vincent Halupczynski, lead partner on the auditing team, who describes "this case [as] a classic example"

---

36. The minutes from the shareholders meeting of February 18, 2003, at which Mr. Miller was present, reveal that a draft of the "year end financials" was reviewed and approved. *Id*. at 43. Similarly, there is a notation in the 2003 Financial Statement reflecting the transfer of automobiles and parts between Landmark Chevrolet and GMD. *Id*. at 58. The shareholder meeting minutes from February 2004 reflect that Gary Miller was present when the financial statements were reviewed. *Id*. at 65. The Notes to the 2004 Financial Statement again reflect the transfer of automobiles and parts between these parties and the shareholder meeting minutes from February 23, 2005 show that Gary Miller was present at the meeting at which the year-end financials were reviewed. *Id*. at 87.

of how fraud by management can escape detection by an audit. *See* ECF No.131 at ¶ 10. Furthermore, "it is not an auditor's responsibility to determine whether the related party transactions were fair, or at arms-length, and no opinion was sought or rendered on that issue. Carter and Brent Doolittle had that responsibility." *Id.* at ¶ 21.

This Court need not determine whether the audits from 2002-2004 were sufficient storm warnings. While the existence of the dealership-to-dealership transactions as revealed in the year-end financial statements may constitute storm warnings, the evidentiary record shows that GMD undertook reasonable diligence to steer clear. Plaintiff has met its burden to show that "heeding the storm warnings, they exercised reasonable diligence but were unable to find and avoid the storm." *Cetel*, 460 F.3d at 507.

GMD had a company policy that all transactions between family members or related entities be conducted and approved by a disinterested officer of GMD. ECF No. 131, Declaration of Gary Miller, page 21, ¶ 14. The policy was a "best practice to protect the Doolittles from claims of a conflict of interest." *Id.* at ¶ 15. Mr. Miller admits that after he became aware of transactions between Landmark and GMD, he spoke with Brent and Carter Doolittle "on multiple occasions" about how the policy was intended to protect them. *Id.* at ¶ 21. On each occasion, Mr. Miller was "led to believe that" Brent and Carter would have all future transactions approved by a disinterested officer as per company policy. *Id.* at ¶ 22.[21]  Thus, Defendants' arguments about the statute of limitations fail to dismiss the RICO claim against them.

---

[21] As further evidence supporting its reasonable diligence, Plaintiff points to the deposition of Kevin Doolittle who purported testified that it would have been "insane" and "ridiculous" for Mr. Miller to suspect any improper about the transactions between the dealerships. *See* ECF No. 129, page 44 n.162. This evidence is not in the record produced to this Court.

### 5)      Damages

Finally, Defendants argue that the relief sought in Plaintiff's complaint are not recoverable as a matter of law under RICO because they are speculative.

In opposition to the motion for summary judgment, GMI has provided a declaration by its expert as to GMD's damages. According to the expert, GMD suffered calculable and verifiable damages as a result of the Defendants' fraudulent activity. Defendants caused GMD to lose $76,733 on the fifty-one transactions from Landmark to GMD and $39,527 on the forty-four transactions from GMD to Landmark. *See* ECF No. 131, page 7 ¶ ¶ 21-22. These calculations do not include the lost profits which GMD could reasonably have anticipated from the sale of each vehicle.

Such damages are not speculative and so the Defendants' request for summary judgment will be denied in this regard.

### B.      State law claims

### 1)  Introduction

Plaintiff raises claims of fraud and constructive fraud, conversion of corporate property, breach of fiduciary and employee duty,[22] unjust enrichment, aiding and abetting and conspiracy under state law. To review, the conversion and conspiracy claims, are levied against all four Defendants. The aiding and abetting claim is brought against Kevin Doolittle and Landmark Chevrolet. Finally, all other legal claims are brought against Carter Doolittle and Brent Doolittle.

---

[22] Although they seek summary judgment in their favor on all counts, Defendants do not make any argument for summary judgment on the breach of employee duty claim at Count VIII. *See* ECF No. 122, page 35 ECF No. 121-1, page 1.

All of these claims are based on the factual allegations regarding 1) the transfer of autos between dealerships and 2) the employment-related actions of Carter and Brent.

### 2) Statute of limitations

Apart from the unjust enrichment claim which has a statute of limitations of four years, the state law claims are time barred after two years. Defendants move for summary judgment based on the statute of limitations arguing that all of the state claims are barred by the appropriate statute of limitations. In support of their abbreviated argument, Defendants argue only "the undisputed evidence is that Plaintiff did discover the transactions underlying all the injury allegations in the complaint prior to August 2007" and they cite to their discussion of statute of limitations on the RICO claim. *See* ECF No. 122, page 26.

For all the reasons the statute of limitations defense fails as to the RICO claim, the statute of limitations fails as to the state law claims. Even more so than the RICO claim, the state claims stem from more than only the transfer of cars between the Landmark dealerships and GMD. As Defendants have pointed to no other evidence in support of their argument, summary judgment will be denied in this regard.

### 3) Limitation of damages for lost profits

Defendants argue that Plaintiff may not recover lost profits and diminished value in damages on its claims for fraud (at Counts I and II only), conversion (Count IV), and conspiracy (Count X).

Plaintiff agrees that any damages for "lost profits" are not recoverable on these claims under the law. *See* ECF No. 129, page 48. Instead, Plaintiff clarifies that it is seeking damages

based on its real and actual losses suffered. *Id.* at page 49. Plaintiff points to evidence that, at trial, will prove its actual losses. *Id. citing* ECF No. 131, Declaration of CPA Carl Woodward, ¶¶ 21-23, 34-35[23]. Mr. Woodward testifies that GMD lost at least $39,527 on the forty-four transfers from itself to Landmark [*id.* at ¶ 21] and $76,733 on fifty-one transfers from Landmark to GMD [*id.* at ¶ 22]. Defendants' motion will be denied.

### 4) Economic Loss and Gist-of-the-Action Doctrines

Next, Defendants argue that because the tort claims against Carter and Brent Doolittle based on fraud (Counts I, II, and III) and breach of fiduciary duty (Count VI) and against Kevin Doolittle and Landmark for aiding and abetting (Count IX) are based in contract, they fail as a matter of law. Defendants assert that these claims are barred by the economic loss doctrine and the gist-of-the-action doctrine under Pennsylvania law. *See* ECF No. 122, page 28-29. In opposition, Plaintiff maintains that Defendants' argument is a mischaracterization of Plaintiff's claims. *See* ECF No. 129, page 52.

The Third Circuit has explained that "Pennsylvania courts use two methods to determine whether tort claims that accompany contract claims should be allowed as freestanding causes of action or rejected as illegitimate attempts to procure additional damages for a breach of contract: the "gist of the action" test and the "economic loss doctrine" test." *Bohler–Uddeholm Am., Inc. v. Ellwood Group, Inc.,* 247 F.3d 79, 103 (3d Cir. 2001). Both doctrines "bar relief for a cause of action that is more contractual than tortious in nature." *Markocki v. Old Republic National Title*

---

[23] Plaintiff also points to evidence at ¶ 36 of the Woodward Declaration [ECF No. 131] in support of the statement that Brent Doolittle deprived GMD of $33,305 in service warranty commissions. ECF No. 129, page 51 n.179. Yet the Woodward Declaration lacks a ¶ 36 and there is no other paragraph that references Brent Doolittle's involvement in the taking of service warranty commissions.

*Ins. Co.,* 2007 WL 4142757, *6 (E.D.Pa. Nov.19, 2007). Under Pennsylvania law, the "gist of the action" doctrine bars tort claims "where the gravamen of the allegation is in actuality a claim against a party for breach of its contractual obligations." *Replica Auto Body Panels and Auto Sales Inc. v. inTech Trailers Inc.*, 454 F. Supp. 3d 458, 464 (M.D. Pa. 2020) *citing Bruno v. Erie Ins. Co.*, 630 Pa. 79, 106 A.3d 48, 53 (2014).[24] S*ee also Bohler–Uddeholm Am., Inc.,* 247 F.3d at 104 ("A claim should be limited to a contract claim when 'the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied in the law of torts.'"). Similarly, the economic loss doctrine bars a plaintiff from recovering tort damages for economic losses stemming solely from a breach of contract. *See McDonough v. State Farm Fire & Cas. Co.,* 365 F. Supp. 3d 552, 559 (E.D. Pa. 2019) *citing Werwinski v. Fort Motor Co*., 286 F.3d 661, 671 (3d Cir. 2002).[25]

At their core, both doctrines involve the presence of a contractual relationship between the parties. Although they argue (briefly) that these state law claims are premised on the contractual relationship between the parties, Defendants have not pointed to evidence of any contract between either Carter or Brent Doolittle and GMD or any contract involving Landmark

---

[24] The gist-of-the-action doctrine applies in four general situations: "(1) where the tort claim arises solely from a contract between the parties, (2) where the duties allegedly breached were created and grounded in the contract itself, (3) where the liability stems from a contract, and (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract." *Replica Auto Body Panels & Auto Sales Inc. v. inTech Trailers Inc.,* 454 F. Supp. 3d 458, 464 (M.D. Pa. 2020) (internal citations omitted).

[25] The economic loss doctrine prohibits legal claims "(1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of a contract." *McGuckin v. Allstate Fire & Cas. Ins. Co.*, 118 F. Supp. 3d 716, 720 (E.D. Pa. 2015) (internal quotations omitted). *See also Duquesne Light Co. v. Westinghouse Elec. Corp.,* 66 F.3d 604, 618 (3d Cir.1995) (economic loss doctrine bars "plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract.").

and/or Kevin Doolittle and GMD. *See* ECF No. 122, pages 28-29. As the movant, it is Defendants' burden to support their summary judgment motion with evidence. *See* Fed.R.Civ.P. 56(c)(1)(A) and (c)(3); *Celotex*, 477 U.S. at 323. Defendants have failed to meet this burden and summary judgment will be denied in this regard.

### 5)  The Fraud Claims

Defendants argue that GMI cannot meet its burden to demonstrate certain elements of its fraud claims (in Counts I, II, and III). Defendants maintain that their conduct was fully transparent, and they never misrepresented anything about their conduct. Again, Defendants limit their argument to the fraudulent transfer of autos between Landmark and GMD ignoring all other factual scenarios on which these claims are based.

To prevail on a common law fraud claim under Pennsylvania law, a plaintiff must prove (1) a representation that is (2) material to the transaction, (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true; (4) intent to mislead another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) injury proximately caused by the reliance. *Luketich v. USAA Cas. Ins. Co.*, 2020 WL 5669017, at *7 (W.D. Pa. Sept. 24, 2020) *citing Shuker v. Smith & Nephew PLC*, 885 F.3d 760, 778 (3d Cir. 2018).

In their abbreviated discussion, Defendants argue that the actions of Brent and Carter Doolittle do not involve any misrepresentation because the dealership-to-dealership transaction were entered and appear in GMD's books and records and  were accessible to management, were provided to and examined by GMD's auditors in conjunction with annual audits, and were reviewed with the officers, directors, and shareholders at annual meetings. ECF No. 122, page 31.

27

In opposition, Plaintiff argues that there is at least a genuine issue of material fact as to whether Brent and Carter Doolittle engaged in misrepresentations or omissions to GMD to advance their widespread and systematic fraud and theft from GMD. ECF No. 129, page 55. Plaintiff points to a plethora of evidence to support false representations made by Carter and Brent Doolittle. This Court need not reiterate here all the evidence cited by Plaintiff, as even a sampling of it defeats Defendants' argument. Plaintiff directs the Court's attention to evidence that Brent and Carter were responsible for

- the dealership-to-dealership transfers without approval by someone other than themselves [*see* ECF No. 131, Woodward Declaration, ¶ 24];

- having service warranty commission payments which belonged to GMD sent to directly to their homes after misrepresenting to the warranty company that they were the sole owners of GMD [ECF No. 131 Woodward Declaration, ¶ 24; ECF No. 124-5, Deposition of Brent Deposition dated February 25, 2013, page 8]; and

- allowing Carter to receive free gas from GMD from 1987 through 2010 despite it not being part of his compensation package  [ECF No. 131 Woodward Declaration, ¶ 24].

Plaintiff has met its burden of producing evidence establishing misrepresentation by Brent and Carter Doolittle to support these fraud claims and defeat Defendants' motion for summary judgment.


6)  **The Conversion Claim**

Plaintiff alleges that all four Defendants "engaged in a purposeful course of action

intended to deplete, deprive, and convert the corporate assets" of GMD. ECF No. 1, ¶ 90. This claim is based on both the transfer of autos between dealerships and the employment-related allegations involving Carter and Brent Doolittle.[26]

Under Pennsylvania law, the tort of conversion[27] is the deprivation of another's right of property, or use or possession of a chattel, or other interference therewith without the owner's consent and without legal justification.[28] *Universal Premium v. York Bank & Trust Co.,* 69 F.3d 695, 704 (3d Cir.1995); *Eisenhauer v. Clock Towers Assoc.,* 399 Pa.Super. 238, 582 A.2d 33, 36 (1990). Money can be the subject chattel of a conversion claim. *Broederdorf v. Bacheler*, 129 F. Supp. 3d 182, 195 (E.D. Pa. 2015).

Defendants argue that they are entitled to summary judgment because Plaintiff's conversion claims are precluded by the presence of contracts: 1) the vehicle transactions are contractual, governed by the individual sale/purchase documents and 2) the employment-related conduct is governed by the parties' employment agreements, oral and written, and the Policies and Procedures. *See* ECF No. 122, page 32. This is not dissimilar to Defendants' economic loss and gist-of-the-action arguments to the fraud and breach of fiduciary duty claims.

---

[26] Plaintiff points to evidence of multiple ways in which Defendants were responsible for the conversion of Plaintiff's assets. *See* ECF No. 131, page 24, ¶ 39.

[27] The tort of conversion is a strict liability offense in Pennsylvania. *See Broederdorf v. Bacheler*, 129 F. Supp. 3d 182, 195 (E.D. Pa. 2015) *citing Fort Washington Res., Inc. v. Tannen*, 846 F. Supp. 354, 362 (E.D. Pa. 1994).

[28] "Conversion can be committed in several ways: (1) acquiring possession of the chattel with the intent to assert a right to it which is adverse to the owner; (2) transferring the chattel and thereby depriving the owner of control; (3) unreasonably withholding possession of the chattel from one who has the right to it; and (4) misusing or seriously damaging the chattel in defiance of the owner's rights." *Prudential Ins. Co. of Am. v. Stella*, 994 F. Supp. 318, 323–24 (E.D. Pa. 1998) *citing Fort Washington Res., Inc. v. Tannen,* 846 F. Supp. 354, 361 (E.D.Pa.1994).

While "general policy disfavor[s] tort recovery based on a contractual breach" (*Pittsburgh Const. Co. v. Griffith*, 834 A.2d 572, 584 (Pa. Super. 2003)) under Pennsylvania law[29], Defendants have again pointed to no evidence in support of their argument. Without evidence of the contracts upon which they base this argument, Defendants' motion for summary judgment is unsupported and must be denied.

### 7)  The Unjust Enrichment Claim

Defendants argue that they should be awarded judgment on Plaintiff's unjust enrichment claim because the claim is inapplicable "in the face of the parties' contractual relationship." ECF No. 122, page 33. Again, like their conversion argument, Defendants characterize the vehicle transfers as governed by individual sale/purchase documents and the employment-related conduct as governed by employment agreements and Policies and Procedures. *See* ECF No. 122, page 33.

To establish a claim for unjust enrichment, a plaintiff must prove (1) a benefit conferred on the defendant by the plaintiff, (2) appreciation of such benefit by the defendant, and (3) acceptance and retention of such benefit under circumstances such that it would be inequitable for the defendant to retain the benefit without payment to the plaintiff. *iRecycleNow.com v. Starr Indem. & Liab. Co.*, 674 Fed. App'x 161, 162–63 (3d Cir. 2017) *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 273 (3d Cir. 2010).

Under Pennsylvania law, the doctrine of unjust enrichment contemplates that "[a] person who has been unjustly enriched at the expense of another must make restitution to the

---

[29] The Superior Court notes that this "general policy" is not unlike the gist-of-the-action doctrine. *Id*.

other." *Wilson Area Sch. Dist. v. Skepton*, 586 Pa. 513, 520, 895 A.2d 1250, 1254 (2006) *citing*

*Binns v. First National Bank of California, Pennsylvania,* 367 Pa. 359, 80 A.2d 768, 775 (1951).

"[T]he doctrine of unjust enrichment is inapplicable when the relationship between parties is

founded upon a written agreement or express contract." *Id*. Whether the doctrine applies depends

on the unique factual circumstances of each case. *See Stoeckinger v. Presidential Fin. Corp. of

Delaware Valley*, 2008 Pa. Super. 95, ¶ 12, 948 A.2d 828, 833 (2008) *quoting Styer v. Hugo*, 422

Pa. Super. 262, 268, 619 A.2d 347, 350 (1993).

Again, because no evidence supports it, Defendants' motion for summary judgment must

be denied in this regard.


### 8) The Civil Conspiracy Claim

Defendants move for judgment as a matter of law on this claim arguing that Plaintiff

failed to plead facts showing that Defendants acted with the sole purpose of injuring Plaintiff.

*See* ECF No. 122, page 34. Plaintiff's opposition brief omits any discussion of the civil

conspiracy claim. Although Defendants urge this Court to accept Plaintiff's silence on this

argument as a concession[30], this Court will not do so especially since Defendants' motion in this

regard must be reviewed under a Rule 12 standard[31] rather than the Rule 56 standard of review

applied throughout the rest of this motion.

---

[30] *See* ECF No. 144, Defendants' Reply Brief, page 2.

[31] Under Federal Rule of Civil Procedure 12(c), judgment on the pleadings will be granted only if
the movant establishes that no material issue of fact remains to be resolved and that he is entitled
to judgment as a matter of law. Rule 12(b)(6) provides the standard of review applicable to
motions for judgment on the pleadings: the court must accept the factual allegations as true and
draw all reasonable inferences presented in the pleadings in the light most favorable to the
plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007).

To state a civil action for conspiracy, a complaint must allege (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage. *McKeeman v. Corestates Bank, N.A.,* 2000 Pa. Super. 117, ¶ 14, 751 A.2d 655, 660 (2000) *citing McGuire v. Shubert,* 722 A.2d 1087, 1092 (Pa.Super. 1998). Moreover, "[p]roof of malice, i.e., an intent to injure, is essential in proof of a conspiracy." *Liberty Mut. Ins. Co. v. Gemma*, 301 F. Supp. 3d 523, 544 (W.D. Pa. 2018) *quoting DePuy Synthes Sales, Inc. v. Globus Med., Inc.*, 259 F. Supp. 3d 225, 248 (E.D. Pa. 2017).

Defendants argue that Plaintiff does not allege any intent by any of the Defendants to injure Plaintiff. This is a misreading of the complaint as Plaintiff alleges that, as part of the civil conspiracy, Defendants acted so "as to cause [GMD] financial losses." ECF No. 1, ¶ 138(a) and (b). Defendants' motion will be denied in this regard.

An appropriate Order follows.

32